UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERMAN HAUPRICH,<br><br>                    Plaintiff,<br><br>          v.<br><br>FIREMAN'S FUND INSURANCE COMPANY,<br><br>                    Defendant. | Case No.  13-cv-01609-JCS<br><br>**ORDER DENYING DEFENDANT FIREMAN'S FUND INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Re: Dkt. No. 42 |

## I.    INTRODUCTION

Plaintiff Germain Hauprich asserts claims against her former employer, Fireman's Fund Insurance Company ("FFIC"), for age and sex discrimination.  FFIC brings a Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Motion").  A hearing on the Motion was held on June 20, 2014 at 9:30.  For the reasons stated below, the Motion is DENIED.[1]

## II.    BACKGROUND

### A.    Facts[2]

#### 1.  Plaintiff's Qualifications and Employment History

Hauprich received a BS in Quantitative Business Analysis from Indiana University in 1983, and an MS in Accountancy from DePaul University in 1987. JSUF ¶¶ 2-3.  In 1990, she earned her certification from the State of Illinois as a Certified Public Accountant. JSUF ¶ 4.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] In its factual background section the Court relies on the facts set forth in the parties Joint Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("JSUF").  In addition, the Court relies on facts that it finds to be undisputed, based on the parties' briefs and supporting evidence, even where the parties have not expressly stipulated to those facts.

Between 1994 and September 2002, Hauprich served as an Assistant Vice President with CNA Insurance.[3]  JSUF ¶ 5.  According to Hauprich, during her "managerial tenure with CNA, [she] managed up to approximately thirty employees."  Hauprich Decl., ¶ 39.

In September 2002, Hauprich began her employment with FFIC in the position of Senior Director in its Finance Department.  JSUF ¶ 6.  During her first five years of employment with FFIC, Hauprich held various Senior Director positions in FFIC's Finance Department.  Declaration of Chantelle C. Egan in Support of Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Egan Decl."), Ex. A (Hauprich Dep.) at 55-65.  In 2007, FFIC promoted Hauprich to Vice President, an executive level position, in its Finance Department.  JSUF ¶ 14.

Hauprich was promoted to a leadership role over the consolidated Financial Consulting group in or around January 2012.  JSUF ¶ 34.  Although her title of Vice President of Financial Consulting remained the same, *id.*, Hauprich "went from being the leader of the commercial finance team and also having all the finance teams that support the business reporting to [her], to being the leader of all finance consulting and having all of them, including the shared service finance teams report to [her]."  Egan Decl., Ex. A (Hauprich Dep.) at 159.  Consequently, Hauprich's responsibilities expanded and the number of subordinates who reported to her increased.  JSUF ¶ 36.[4]  Hauprich was fifty years old when she received this promotion. JSUF ¶ 34.

_____

[3] Plaintiff began her employment with CNA in 1984 but did not hold a managerial position at CNA until 1991.  *See* Declaration Of Germain Hauprich In Support Of Plaintiff's Opposition To Defendant's Motion For Summary Judgment Or, In The Alternative, Summary Adjudication ("Hauprich Decl.") ¶¶ 36-37.

[4] According to Plaintiff, "[t]hroughout [her] ten year employment with Defendant, at any given time [she] generally managed anywhere from approximately five to twenty-five employees." Hauprich Decl. ¶ 41.  FFIC objects to this testimony, asserting that it should be stricken on the basis that it is inconsistent with Plaintiff's sworn deposition testimony. Reply at 15 (citing Egan Decl., Ex. A (Hauprich Dep.) at 55-65).  In the cited deposition testimony, Hauprich testified that in her initial position at FFIC (which she held for approximately one year, from 2002 to 2003) she had five to seven "direct reports."  Egan Decl., Ex. A (Hauprich Dep.) at 56.  She also testified that during a six-month period when she was reporting to Doug Franklin she had no direct reports.  *Id*. at 64-65.  However, the Court finds no testimony in the cited pages of the Hauprich deposition that conflicts with the statement in Hauprich's declaration that *generally* she managed between five and twenty-five individuals while employed by FFIC.

United States District Court
Northern District of California

1    FFIC terminated Hauprich's employment effective November 13, 2012.  JSUF ¶ 47.  At

2    that time, she was 51 years old.  JSUF ¶ 48.

3                    **2.   Restructuring and Personnel Changes at FFIC in 2011**

4    Between 2003 and August 2011, Hauprich reported –either directly or indirectly – to Jill

5    Paterson.  Declaration of Alan Adelman in Support of Plaintiff's Opposition to Defendant's

6    Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Adelman Decl."),

7    Ex. 5 (Paterson Dep.) at 43.  Paterson served as FFIC's Chief Financial Officer ("CFO") from

8    October 2004 through June 2011 and remained as an FFIC employee until December 2011.

9    Adelman Decl., Ex. 5 (Paterson Dep.) at 17;  JSUF ¶ 29.

10   In July 2011, Lori Fouché, who had previously led FFIC's Commercial Insurance unit,

11   was made Chief Executive Officer ("CEO") of FFIC. Egan Decl., Ex. A (Hauprich Dep.) at 69;

12   JSUF ¶ 27.  Kevin Walker became the CFO of FFIC – filling Paterson's former position – on or

13   about September 19, 2011.  JSUF ¶ 30.  As of that date, Walker, who was 48 at the time, became

14   Hauprich's manager.  JSUF ¶ 32; Declaration of Kevin Walker in Support of Motion for Summary

15   Judgment or, in the Alternative, Summary Adjudication ("Walker Decl.") ¶ 2 (stating that Walker

16   turned 50 in November 2012).  As CFO, Walker managed the Finance Department, which had

17   between 145 and 155 employees.  JSUF ¶ 31.

18   According to Walker, when he became CFO he attempted to shift the culture from one of

19   confrontation to collaboration.  Walker Decl. ¶ 5.  In his declaration, Walker states:

20          In partnership with Lori Fouché, then Chief Executive Officer of
             FFIC, I began promoting a culture of collaboration in Finance soon
21          after my arrival at FFIC. In adopting this new culture, we strove to
             eliminate the adversarial approach within Finance and between
22          Finance and the business at large. I also sought to improve the
             perception of Finance by building supportive relationships between
23          Finance and its business partners, as well as encouraging respectful
             consensus building. I value active listening and professional
24          communication, and these values were incorporated into my efforts
             to change Finance's culture. Upon my arrival, I conveyed to my
25          direct reports my expectations.

26   *Id*.  Similarly, one of Hauprich's former managers at FFIC, Doug Franklin, testified that prior to

27   Walker's appointment as CFO,  FFIC's business was deteriorating and therefore the Finance

28   Department needed to take  a confrontational approach.  Egan Decl., Ex. L (Franklin Dep.) at 74.

3

However, "[Walker] came in looking to change the direction of [F]inance from adversarial to collaborative, very different approach.  And I think he had conversations with all of us about moving in that direction."  Egan Decl., Ex. L (Franklin Dep.) at 74.

Meanwhile, FFIC's Munich-based parent company, Allianz, was directing FFIC to restructure to implement a "target operating model."  Adelman Decl., Ex. 3 (Walker Dep.) at 207.  As part of this restructuring, FFIC consolidated two teams of Financial Consultants, the Shared Services Consulting team (which supported shared services cost centers such as IT and human resources) and the business consulting team (which supported business profit centers), as a single group. JSUF ¶ 33.   In January 2012, Walker appointed Hauprich to head the entire financial consulting group, as discussed above.[5]

### 3.  FFIC Policies and Practices Regarding Discipline and Termination

HRONCALL for Managers, a shared human resources service, provides human resources support for FFIC and its onsite Human Resources Business Partners ("HRBP").  Declaration of Karmen Nelson in Support of Defendant's Reply Memorandum in Support of its Motion for Summary Judgment, or in the Alternative, Summary Adjudication ("Nelson Decl.") ¶¶ 1-2.  FFIC does not have a formal written progressive discipline policy but managers' guidelines are maintained on the FFIC intranet in a document entitled Progressive Counseling - Guidelines."  *Id.* ¶ 3 & Ex. A.  These guidelines explain:

> Progressive  Counseling  generally  begins  with  the  manager explaining  the  problems  with  the  employee's  performance, attendance, or conduct.  The manager may then choose to provide the employee with an opportunity to resolve deficiencies through a corrective action plan, when appropriate.  However, there may be instances when the manager determines that it is in the best interest of the Company and/or the employee to terminate the employment relationship without progressing through these guidelines.

> These guidelines do not change the at-will nature of the employment relationship.   The Company or the employee may terminate the employment relationship at any time, with or without cause.

---

[5] According to Paterson, FFIC considered a similar consolidation in 2010, in which "the entire team [would] merge under [Hauprich's] management," but the idea was rejected because "it was too big a job for her to take over and be successful."  Adelman Decl., Ex. 5 (Paterson Dep.) at 59.

1  Nelson Decl., Ex. A at FFIC188.

2  **4. Performance Reviews**

3      While employed by FFIC, Hauprich consistently received high overall ratings on her

4  performance reviews. *See* Hauprich Decl., Ex. 1 (2003 Performance Review with Overall Rating

5  "Strong Contribution"); Ex. 3 (2005 Performance Review with Overall Rating of "Exceptional

6  Results"); Ex. 4 (2006 Performance Review with Overall Rating of "Exceptional Results"); Ex. 5

7  (2007 Performance Review with Overall Rating of "Superior Results"); Ex. 6 (2008 Performance

8  Review with Overall Rating of "Superior Results"); Ex. 7 (2009 Performance Review with

9  Overall Rating of "Superior Results"); Ex. 8 (2010 Performance Review with  Overall Rating of

10 "Superior Results").[6]  The lowest overall rating Hauprich received while employed by FFIC was

11 "Successful Results" in April 2012. *Id*., Ex. 16.

12     Notwithstanding the high overall ratings, beginning in 2008 (after Hauprich had been

13 promoted to Vice President in 2007), Hauprich's managers began to express some concerns about

14 Hauprich's interpersonal and leadership style in her performance reviews.  FFIC relies heavily on

15 the negative comments in the performance reviews, while Hauprich contends FFIC has taken these

16 criticisms out of context.  To avoid mischaracterizing the performance reviews, the Court quotes

17 from them extensively below.

18     a.  2008 Annual and Mid-Year Performance Reviews

19     Hauprich's annual review for 2008 was completed by her manager, Doug Franklin, with

20 Jill Paterson acting as Second Level Reviewer.  Hauprich Decl., Ex. 6.  As noted above, Hauprich

21 received an Overall Rating of "Superior Results" (between "Exceptional Results" and "Successful

22 Results").  *Id*.  The performance review addressed five goals and included comments from Doug

23 Franklin and feedback from Hauprich, Lori Fouché (the current head of Commercial Insurance at

24 FFIC), and Roger Nulton (former head of Commercial Insurance).  *Id*.; *see also* Egan Decl., Ex.

25 A (Hauprich Dep.) at 104-105.  Under Goal #1 (BFO Team Goals - Milestones), Hauprich

26

27 ─────────────────

[6] Plaintiff's 2004 performance review does not identify an overall rating. Plaintiff's ratings for the
28 four component goals ranged from Strong Contribution to Exceptional Contribution.  JSUF ¶ 9;
Hauprich Decl., Ex. 2.

United States District Court
Northern District of California

received a rating of 4[7] and Franklin wrote:

> Germain is a highly influential member of my team, with the ability to help me with various issues throughout the year. She can take over when I am out, with the possible exception of the risk stuff, but I rely on her most to keep things running. Our teamwork requires her to be on board and influencing and she always puts effort into our team efforts.

Hauprich Decl., Ex. 6 at PLAINTIFF-000064. Under Goal #2 (Feedback), Hauprich received a rating of 4 and the following feedback from Fouché and Nulton is provided:

- Strong command of the drivers of the balance sheet
- Proactive in raising red flags of future financial issues
- Proactive in recommending solutions to problems
- Shares her point of view regardless of how popular or difficult that message might be
- Challenges and pushes the organization to find solutions
- Good partner - has taken the new RUEs and new President under her wing and works closely with them

Areas to focus on going forward
- Completing presentation materials earlier
- Refining sell vs. tell skills when influencing others

*Id.* Under Goal #4 (Performance Management), Hauprich received a rating of 4 and Franklin wrote:

> Germain managed her top talent extremely well in [2008],[8] leading to strong performance in key people and the ability to get them prepared for promotion. Germain has improved her management skills over the past few years and her employees enjoy working with her leading to strong retention. Germain will need to deal with some poor performers in 2009, but I expect her to handle that aspect as well.

*Id.* at PLAINTIFF-000065. Under Goal #5 (Personal Development), Hauprich received a rating of 4 and Franklin wrote:

> Germain continues to be one of my most valued DRs (over all years of my managerial career). She is diligent, creative, and has the influence skills to make things happen in the organization. Sometimes she can take things a bit too far, as mentioned by Lori/Roger, but I much prefer that issue than the issue of being weak and a lack of influence skills. She gets things done, herself, her

---

[7] According to the Performance Review form, ratings range from 1 to 5, where 5 signifies "Exceptional Results," 4 signifies "Superior Results," 3 signifies "Successful Results," 2 signifies "Results Need Improvement" and 1 signifies "Unacceptable Results." *See* Hauprich Decl., Ex. 6 at PLAINTIFF-000059.
[8] The comment refers to 2009. In context, it is apparent this is a typographical error.

team, and in those she consults with on the business side.  A true asset to AZFF.

Germain will need to focus on her worklife balance and that of her team.  Our team, her team included, has expressed concerns with worklife balance and we, as leaders, need to put the right example forward. This will take commitment on our part to our balance, but also, take commitment from us to reduce work on such areas as BRMs, P2Ps, etc.  Management is looking for less from us, reduced information that is more targeted and less voluminous.  This is an effort we need to pursue across all areas, but I need Germain's help and support in moving in this direction.  I have every confidence she will be able to help me drive this in 2009.

*Id.*

Doug Franklin also completed a mid-year review in 2008.  Hauprich Decl., Ex. 6 at

PLAINTIFF-000067-68.  In the mid-year review, Franklin provided the following performance

summary:

Germain is a tremendous asset to FFIC.  She is knowledgeable, influential, and hard working.  She is 100% dedicated to ensuring FFIC achieves results.  Her results orientation keeps our business people focused on results.  She is a great team leader and mentor to others and a solid partner to me in driving the entire BFO goals and milestones.  She is [a] valuable member of the officer level team.

Items for Germain to work on:
1) Germain can add complexity to work that is above and beyond at times.  This can lead to additional work and can cause her work-life balance to get away from her.  I think she has made significant progress in this area over the past several months.  I will be confirming this with her in the midterm review, but she can continue to find places to reduce complexity.

2) She has an individual that is not getting up to speed as quickly as hoped.  She will need to do what it takes to get this individual up and running or move down a performance warning path with him. . .

*Id.* at PLAINTIFF-000067.

b.  2009 Annual Review

Hauprich's annual review for 2009, like the 2008 annual review, was completed by Doug

Franklin, with Jill Paterson acting as Second Level Reviewer.  Hauprich Decl., Ex. 7.  Hauprich

again received an Overall Rating of "Superior Results."  *Id.* Under Goal #2 (BFO/CRO Team

Goals/Milestones), Hauprich received a rating of 5 and Franklin wrote:

Germain is [an] outstanding leader on my team.  She is my top individual for driving process across all my areas and has been critical to me in driving teamwork and improved results against

these milestones. I rate her 5 for her passion and ownership across all areas.

*Id.* at PLAINTIFF-000072. Under Goal #3 (Customer Feedback), Hauprich received a rating of 4 and the following feedback is provided:

> Lori Fouché rated Germain a 4 noting her significant contributions to Commercial and outstanding leadership both financially and operationally. However, Lori does look for Germain to find some areas to soften her message when the hard line is not quite as necessary.
>
> Jill [Paterson] has tremendous respect for Germain and her work, noting Germain's strong impact on Commercial in 2009, at a time when Lori needed it most. She also notes that Germain should soften the edges a bit on some communications.

*Id.* Franklin also provided feedback, stating as follows:

> Germain had a tremendous year in 2009 in driving Commercial during a time of such major transition. Her value is highly regarded and her leadership stepped up tremendously in 2009. She must continually work on how she influences and pick her battles, but everyone agrees, they are better because she chooses to step in where others are unwilling and we all thank her for being one that likes to influence others['] actions to meet our financial goals.

*Id.* With respect to Goal #8 (Personal Development), Hauprich received a rating of 4 and Franklin wrote, in part, as follows:

> I was truly impressed with her development during the year. She was not just a leader, she was a focal point of most critical initiatives and concepts. She was Lori's top confidant and provided strong influence in most areas with most areas being non-financial. She is [a] tremendous part of the CI team and I am pleased I had the chance to see it firsthand.

*Id.* at PLAINTIFF-000074.

### c. 2010 Annual Review

Hauprich's annual review for 2010 was completed by Jill Paterson acting as Second Level Reviewer. Hauprich Decl., Ex. 7. Hauprich again received an Overall Rating of "Superior Results." *Id.* With respect to the Productivity/Efficiency and Business Leadership Feedback categories of her Performance goals, Hauprich received a 4 rating. *Id.* at PLAINTIFF-000076-77. She received a 3 in the category of Financial Growth and Profit. *Id.* at PLAINTIFF-000076. In the People category of Performance Goals, Paterson rated Hauprich at 4 and wrote that Hauprich

8

United States District Court
Northern District of California

1    "does a good job in picking staff and mentoring." *Id*. at PLAINTIFF-000078. Similarly, Paterson

2    rated Hauprich as a 4 in People Development. *Id*.

3          With respect to Communication, Paterson gave Hauprich a 3 rating and wrote:

4              This is a difficult one to answer since she differs greatly in parts of
               this goal. Germain communicates well in written form. She
5              delivers presentations with accurate information etc. Where I would
               ask her to improve is in the area of listening and verbal
6              communication. While Germain listens she tends to do so while
               forming her response not to truly understand the comment. She
7              tends to be defensive and reacts with a "give me an exact example."
               She needs to really listen, to process the intent of the comment and
8              to give an open response.

9              In addition, Germain needs to learn to end her presentations etc.
               more clearly. She makes great points but they sometimes get lost in
10             too much verbiage and rambling. Her insights are second to none
               and I don't want them to get lost.

11

12   *Id*. In the area of Interpersonal Skills, Paterson gave Hauprich a rating of 2, that is, Results Need

13   Improvement, referencing her previous comment regarding Hauprich's communication skills. *Id*.

14   at PLAINTIFF-000078-79.

15               d.   2011 Annual Review

16         Except for the goals and objectives, Hauprich's 2011 annual review was completed by

17   Walker, who became Hauprich's manager on September 19, 2011. Adelman Decl., Ex. 3 (Walker

18   Dep.) at 81. (The goals and objectives were set before Walker's arrival at FFIC. *Id*.) Walker

19   testified that in preparing the 2011 performance review he did not talk to Paterson "in any detail"

20   about Hauprich's performance during the months before he arrived at FFIC. *Id*. According to

21   Walker he did, however, seek input from "other [Executive Leadership Group ("ELG")] members

22   in the company." *Id*. Walker gave Hauprich an overall rating of 3, Successful Results. Hauprich

23   Decl., Ex. 16. According to Walker, this rating – which was lower than Hauprich had received in

24   any previous year at FFIC – was intended to "get Ms. Hauprich's attention that her personal style

25   had to change and become aligned with the new cultural values of Finance." Walker Decl., ¶ 8.

26   Similarly, Fouché testified that the lower overall rating was discussed by the calibration meeting

27   of the ELG when it met to approve the performance review. Egan Decl., Ex. M (Fouché Dep.) at

28   26-27. In particular, Fouché testified that in approving the 3 rating, the ELG was "trying to

9

1    balance compensation, compensating her for her efforts, and her accomplishments, but still

2    delivering a message that she needs to take seriously the feedback she's getting and make

3    changes."  *Id*. at 27.

4          The emphasis on Hauprich's interpersonal skills was a consistent theme in the 2011

5    performance review.  With respect to the Productivity/Efficiency category of the Performance

6    Goals, Walker stated:

7              In this environment I have a hard time declaring that any one person
             or one team delivered Exceptional Results, but with that said I
             believe the team did perform at a high level.

8

9              . . .

10             I expect that I will see a culture of collaboration and teamwork
             different from what I have witnessed and been told about during my
             first six months.

11

12   Hauprich Decl., Ex. 16 at PLAINTIFF-000081.

13         In the category of Customer Feedback, Walker wrote:

14             I believe that we again need to look at how things have been done
             historically and how we will do things in the future. The feedback
15             that I have collected about your style of working from your and my
             peers in  the enterprise has been that you are focused and dedicated,
16             that you really know the business and can be a great partner, but that
             your personal style can be disruptive, too direct and comes across in
17             some situations as very harsh.

18   *Id*. at PLAINTIFF-000082. Walker reiterated this point in his comments in the Influence category.

19   *Id*. ("As I said above, my opinion is that you are focused and dedicated, that you really know the

20   business and can be a great partner, but that your personal style can be disruptive, too direct and

21   comes across in some situations as very harsh").

22         With respect to Results Orientation, Walker  gave Hauprich a rating of 4 (rather than the 5

23   rating suggested by Hauprich) and wrote:

24             This is a particularly difficult rating because I do feel that this is
             really what the Finance Team strives for and can produce.  But my 6
25             months here show me that Germain's methods, although well-
             intentioned, cause disruption and even pause as to whether other
26             areas of the company want to work with the consulting area.

27   *Id*. at PLAINTIFF-000082-83.  In the category of Strategic Orientation, Walker wrote:

28             Germain needs to work on her active listening skills in order to

10

1      improve her ability to take into account the immediate objectives, needs or priorities of other parts of the company. We will discuss the fact that we don't have time to get through storming, forming and norming when it is really not necessary. She can be strategic and she can be helpful to establishing a successful operation, but only if she is willing to be part of the team.

*Id*. In the Development Plan area, Walker stated:

      I would like to take the opportunity to work with Germain to identify a path that will work well for both of us going forward. I think it starts with active listening, where I think that most of the time when [Plaintiff] is listening she is already preparing her opinion and response on the topic and does not give the speaker the benefit of the doubt. She needs to listen to everyone's comments, process all of these comments and then give her response in an open collaborative way. The other thing I would like to see is a less critical side of Germain when it comes to individuals outside of finance or, for that matter, inside of finance. When I listen to her, I get the impression that if they are not in Financial Consulting then they are probably not very good and do not understand.

*Id*.

      Despite the negative comments regarding Hauprich's interpersonal skills, Hauprich received Superior ratings on many of her goals on the 2011 performance review. Hauprich Decl., Ex. 16. In fact, according to Hauprich, she received 4 ratings for 60% of the weighted component ratings and 3 ratings for 40% of the weighted component ratings. Hauprich Decl., ¶ 28. Thus, the overall rating of 3 on her 2011 annual performance review was obtained by rounding down. *Id*. According to FFIC Human Resources Business Partner Noreen Carroll,[9] managers have the discretion to round down one or two levels in determining the employee's overall rating. Supplemental Declaration of Chantelle C. Egan in Support of Defendant's Reply Brief in Support of its Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Egan Supp. Decl."), Ex. E (Carroll Dep.) at 93-94.

### e.   2012 Goals and Mid-Year Performance Review

      FFIC's policy with respect to performance goals is that 70% of the employee's goals are based on "results" while 30% are in the category of "competencies." Adelman Decl., Ex. 8 (Carroll Dep.) at 53. In February 2012, Hauprich submitted goals to Walker to be used in her

United States District Court
Northern District of California

---

[9] Carroll was assigned to support the Finance Department around May 2012. JSUF ¶ 42.

United States District Court
Northern District of California

2012 performance review.  Hauprich Decl. ¶ 82.  According to Hauprich, she believed her proposed goals complied with FFIC's 70/30 split policy.  *Id*.  However, in February 2012 Walker emailed Hauprich telling her that he had revised her goals.  Hauprich Decl., Ex. 11.  In his deposition, Walker testified he added more qualitative goals because he felt that the goals Hauprich had proposed focused too heavily on quantitative goals.  Adelman Decl., Ex. 3 (Walker Dep.) at 252.

In July 2012, Walker met with Hauprich to conduct an oral midyear review.  Walker Decl. ¶ 15.  According to Walker, he conveyed to Hauprich, among other things, "the positive feedback he received regarding her ongoing efforts to improve her leadership and interpersonal skills and that [he] valued her technical skills."  *Id*. ¶ 15.  Similarly, Hauprich states that in the oral review, Walker "did not state a single negative word regarding my performance or behavior.  Quite the contrary, Mr. Walker stated nothing but positive comments regarding his observations of my behavior and performance and the feedback that he had received from others."  Hauprich Decl., ¶ 79.

After the oral review, Walker discussed with HRBP Carroll the idea of incorporating into Hauprich's written mid-year review a set of talking points ("Talking Points") that Walker and Carroll had drafted earlier in the spring as part of an ongoing effort to counsel Hauprich on her interpersonal skills.  *Id*. ¶ 14.   The written mid-year performance borrows from the Talking Points (discussed below) and focuses primarily on areas in which Walker believed Hauprich needed to improve, stating as follows:

> Strengths and Significant Accomplishments:
> I recognize and appreciate your business knowledge and expertise
> Areas for Improvement:
> As we discussed in May, I'm struggling with your effectiveness as a leader.  It's not what you're doing – it's how you're going about it.  I'm at a crossroads. If you are going to be successful in this role, you need to change some things.  I expect you to improve your relationships with your business partners and your adversarial approach with your peers. Eliminate the flaming emails and be more collaborative.  Stop the overbearing tone with your DRs and listen to their concerns and ideas.  Consider and implement their ideas. They're your window into the health of the Consulting team.  Focus on being their advocate and let them know you have their back. Stop over-engineering the work and concentrate on your role.
> Review/Summarize:

I am fully supportive of you in your role and have every expectation that you will be able to make these changes so that you will be successful, however,

- you need to recognize these are important changes to make and commit to making them
- you'll need to be open to feedback from me and others in order to make these changes
- you must recognize that your success in your role is within your control

My expectations are that you will:

- Foster Relationships - With your peers, business partners, DRs and staff, to positively impact business performance. Be constructive.   Be a good listener.  Consider and incorporate their ideas.  Be their role model.  Think about what you want to say before you say it and think about how you are coming across with your business partners, DRs, ELG members and staff.
- Develop Capability - Encourage and champion development at all levels of the team; Focus on building people up. Make a positive impact on their careers.   Encourage them to develop new ways to do their jobs and be innovative when approaching Consulting work.  Help them be successful by developing new approaches that will provide quality products but lighten their load whenever possible.   Retain High Performers.
- I will continue to ask for feedback from your business partners on a regular basis, meet with your DRs periodically and continue to meet with you weekly and every quarter.

Hauprich Decl., Ex. 17.   With respect to the absence of specific "Strengths and Direct Accomplishments" on the mid-year review, these apparently were to be provided by Hauprich. Before the written definitely review was completed,  Carroll emailed Walker to ask if Hauprich had sent him any Strengths and Accomplishments, stating :

Did she send you any Strengths or Accomplishments?  If so, please send them to me and I'll add those to her mid-year.  If not, we'll go with what we've got.

Adelman Decl., Ex. 18 (8/15/12 email from Carroll to Walker).   Walker responded, "Go without for now."  *Id.*[10]

### 5.   Employee Complaints, Retention Concerns and Counseling, and Termination

Soon after his arrival at FFIC, Walker had a conversation with Fouché in which she "conveyed to [him] both Ms. Hauprich's strengths as a contributor and her weak interpersonal and

---

[10] In an email to Walker dated August 30, 2012, Hauprich told Walker that she was "shocked" by the written review after the "upbeat and positive" oral review, and that she was "left deflated and bewildered."  Hauprich Decl., Ex. 18 (August 30, 2012 email).

United States District Court
Northern District of California

planning skills." Walker Decl. ¶ 6.  According to Walker, around the same time he was advised by Amy Keyser, then Vice President of Human Resources that he "could terminate Ms. Hauprich because her known weakness did not align with [Walker's] new priorities for the Finance department."  *Id.*    Walker states that at that time he believed Ms. Hauprich's poor leadership skills could be remediated to be more aligned with her technical expertise [but that] Ms. Hauprich's leadership skills did not improve."  *Id.* at 6-7.  According to Walker, he observed that Hauprich "lacked self-awareness and demonstrated poor active listening skills, often exhibited by confrontational responses."  *Id.*  He also states that he observed Hauprich being "disruptive and disrespectful in [his] direct report meetings."  *Id.*   Walker states that in January of 2012, he discussed with Lori Fouché "Ms. Hauprich's using her influence to counterproductively push her own agenda for the 'good of the business.'"  Walker Decl. ¶ 7.  He further states that he "received reports from [his] peers that Ms. Hauprich's demeanor interfered with the business, instead of collaborating to support the needs of the business."  *Id.*

Meanwhile, according to Noreen Carroll, when she became HRBP for the Finance Unit, in March 2012, she "noticed that numerous people had transferred out of, or otherwise left, the Financial Consulting group lead by Ms. Hauprich since January 2012."  Carroll Decl. ¶ 5.  Concerned about employee turnover, she states, she interviewed employees who had transferred out of Financial consulting, as well as Hauprich's "direct reports."  *Id.*  She describes the information she gathered from these interviews as follows:

> During these interviews, I received reports that Ms. Hauprich had a tendency to over-engineer work, resulting in frequent, sometimes unnecessary, re-working of projects and long hours.  There were also complaints of unnecessary "fire drills," which I understood to mean that there was a lack of planning in the group.  Some interviewees also perceived that Ms. Hauprich was inappropriate in meetings and openly, and overly, critical of some members of her staff.

*Id.*  Carroll states that she "apprised Kevin Walker . . . and Amy Keyser, FFIC's then Vice President, Human Resources, of the high rate of turnover in Financial Consulting, as well as the feedback I had received from Ms. Hauprich's current and former subordinates."  *Id.*, ¶ 6;  *see also* Walker Decl. ¶ 9 (stating that Carroll informed him of high turn-over and that they developed

Talking Points together).   According to Carroll, she and Walker talked and decided that Walker should meet with Hauprich to discuss these issues.  Carroll Decl. ¶ 7.  She and Walker developed the Talking Points (discussed above), which Carroll typed up and provided to Walker on May 8, 2012.  *Id.*

Carroll states that after she had provided the Talking Points to Walker but before he had met with Hauprich to discuss them, two employees lodged complaints with Carroll regarding Hauprich.  *Id.* ¶¶ 9-10.  Carroll informed Walker of the complaints, sending him an email message on May 24, 2012 that stated, in part, as follows:

> Kevin I received an email from Jamie Kabanuck (formerly Green) while I was on vacation last week.  She moved from Contollers to the Consulting team a few months ago, is very distressed about the work environment there and asked if we could make an exception to the HR guideline to be in a job for a year before transferring to another. . . . I asked Amy [Keyser] to speak with her while I was out.  Based on our recent discussions,  Jamie's input and a formal complaint I received from Sabrina Reynolds last night,  our recommendation is that we take immediate action to stop the turnover on the Consulting team.  If Jamie leaves, and it sounds like she will one way or the other, 41% of the Consultants will have left the team since January.
>
> If you haven't already, it's time for you to meet with Germain and review the points we discussed the week before last.  Then, meet with her and the DRs.  They need to understand that this level of turnover is unacceptable and they should review workload and processes in order to fix the situation immediately.

Carroll Decl., Ex. J.

On May 30, 2012, Carroll contacted Karmen Nelson, the Director of HRONCALL for Managers, "to inquire about the available avenues for addressing complaints lodged against Ms. Hauprich by her subordinates."  Carroll Decl. ¶ 12.  Carroll states that Nelson told her that "FFIC need not tolerate the behavior described in the complaints, and with the concurrence of Ms. Hauprich's manager and Human Resources, FFIC could move forward with termination."  *Id.*  Carroll further states that she was told that "classic progressive counseling was not required due to the senior level of Ms. Hauprich and thus it was not necessary to involve HRONCALL for Managers if Human Resources and Ms. Hauprich's manager decided to pursue counseling and/or termination of Ms. Hauprich."  *Id.*

15

On May 31, 2012, Walker "met with Ms. Hauprich to discuss her leadership deficiencies and the need for her to make changes." *Id.* Walker states that he did not review the complaints of Kabanuck and Reynolds before the meeting, but that the complaints were the "catalyst to hold a coaching session with Ms. Hauprich immediately." Walker Decl. ¶ 10. According to Walker, he encouraged Hauprich to seek feedback from her direct reports, peers and business partners. *Id.* He states that the Talking Points "accurately reflect the substance of our counseling session on or about May 31, 2012." *Id.* & Ex. A (Talking Points).

Noreen Carroll met with Hauprich on the same day. Carroll Decl. ¶ 13. According to Carroll, she "conveyed to Ms. Hauprich that some of her current and former subordinates reported that they felt overworked and that they perceived that Ms. Hauprich had favorites." *Id.* Hauprich sent an email to Walker later in the day telling him that she had "spent quite some time with Noreen" and describing her efforts to obtain feedback from other managers and direct reports. Walker Decl. ¶ 12 & Ex. C. Hauprich also provided Walker with a detailed action plan reflecting Walker's feedback at the May 31, 2012 meeting and describing her efforts to improve. Walker Decl. ¶ 13 & Ex. D (Action Plan).

Carroll met with Hauprich again on June 5, 2012. Carroll Decl. ¶ 14. According to Carroll, "[d]uring this meeting [Hauprich] informed [Carroll] that she had met with her direct reports to discuss the issue of turnover and that, going forward, she planned to manage one of her newly hired direct reports, Dan McCulloch, differently due to the turnover in his team." *Id.* Carroll states that later that day, McCullough came to her and reported that he felt he was blamed for the departure of Kabanuck and Reynolds from Financial Consulting. *Id.* Two days later, on June 7, 2012, Carroll and Hauprich met again. *Id.* According to Carroll, she told Hauprich that the turnover in Financial Consulting was Hauprich's responsibility and that she could not blame McCullough or any of her other direct reports. *Id.* Carroll states that in early 2012 she advised Walker of the content of her conversations with Hauprich and McCullough. *Id.*; *see also* Walker Decl. ¶ 16.

Walker states in his declaration that following the May 31 "coaching session" he received some positive feedback but he also "continued to receive reports and witnessed [himself] that any

strides Ms. Hauprich had made . . . were not lasting." Walker Decl. ¶ 16. He states that "Executives from outside Finance requested that Ms. Hauprich be excluded from meetings because her demeanor was counterproductive and unnecessarily combative." *Id*. In particular, he stated that FFIC's Chief Underwriting Officer David Zona had told him that "one of his direct reports requested that Ms. Hauprich be kept off an upcoming project." *Id*.

On June 26, 2012, Carroll received a written complaint about Hauprich's management style from another employee, Alison Stark. Carroll Decl. ¶ 15. Because the complaints of Stark and Reynolds were similar, Carroll contacted Keyser at HRONCALL for Managers and asked that they initiate an investigation of the two complaints. *Id*. ¶ 16. Angelique Sullivan, a Human Resources consultant from HRONCALL for Managers, was assigned to conduct the investigation. Declaration of Angelique Sullivan in Support of Defendant's Motion for Summary Judgment, or in the Alternative, Summary Adjudication ("Sullivan Decl.") ¶ 5. Sullivan conducted telephone interviews of both employees and both forwarded to Sullivan emails they had received from Hauprich that they found to be inappropriate. *Id*. ¶¶ 9-10. In light of the similarities between the allegations of the two employees and based on the emails they provided to her, Sullivan found the allegations to be credible and concluded that there was no need to verify the allegations directly with Hauprich. *Id*. ¶ 11.

Sullivan summarized her conclusions in a draft email dated July 5, 2012. *Id*. ¶ 12 & Ex. A at FFIC00003436. Although she never sent the email, Sullivan conveyed its contents to Carroll during a telephone conversation on July 12, 2012. *Id*. ¶ 12. Carroll, in turn, told Sullivan about the May 31, 2012 coaching session with Walker and provided Sullivan with the Talking Points. *Id*. Sullivan "recommended that Mr. Walker's coaching was an appropriate means to attempt to rehabilitate Ms. Hauprich and Mr. Walker, with Ms. Carroll's support, should continue to provide feedback to Ms. Hauprich in order to affect [sic] change if possible." *Id*. According to Sullivan, on July 12, 2012, Carroll forwarded to her the complaint of Kabanuck. *Id*. ¶ 13. Sullivan states that she "reviewed this complaint as part of [her] investigation" but she does not address whether she ever investigated that complaint.

Carroll states in her declaration that in the fall of 2012, she was told by Chief Human

Resources Officer Yvonne Franzese, who had taken over for Keyser while she was on extended leave, that McCullough had complained to her that "Ms. Hauprich was retaliating against him because he had been providing [Hauprich] feedback on her management, as Mr. Walker had requested." Carroll Decl. ¶ 21. Walker states that he too was informed by Human Resources that McCullough had complained about Hauprich being "abusive and disrespectful" and that "he was concerned that Ms. Hauprich was retaliating against him because he provided Ms. Hauprich feedback on her management style, per [Walker's] request." Walker Decl. ¶ 16.

According to Walker, during the month of October 2012 he "decided, with the concurrence of Human Resources, to terminate Ms. Hauprich's employment because she had failed to make improvements in her management and leadership skills during the thirteen months [he] had been her manager." Walker Decl. ¶ 17. Walker states that prior to terminating Hauprich he asked Fouché and FFIC's Chief Underwriting Officer David Zona whether they were aware of "any contributor positions without leadership responsibilities available for Ms. Hauprich to assume" but they were aware of none. *Id.* Carroll states in her declaration that prior to terminating Hauprich Walker consulted Carroll and that she supported the decision to terminate. Carroll Decl. ¶ 22. Sullivan states that she also was informed in October 2012 of the decision to terminate Hauprich and that she supported the decision. Sullivan Decl. ¶ 15.

According to Carroll, she advised Yvonne Franzese on October 5, 2012 that Hauprich was to be terminated from FFIC. Adelman Decl., Ex. 8 (Carroll Dep.) at 204.

Hauprich was 51 years old when she was terminated. JSUF ¶ 48. Walker was 50 years old at the time. JSUF ¶ 49. Carroll was over 60 years old. JSUF ¶ 50. Fouché was 43 years old. JSUF ¶ 51.

### 6.  Hauprich's Complaints About Work Load and Environment

According to Hauprich, on multiple occasions in the first half of 2012 she had conversations with Walker and other managerial employees informing them that the workload that was being assigned to her Financial Consulting team was "crushing." Hauprich Decl. ¶ 91. She states that Walker agreed with her assessment that the workload was "crushing" but told her the burden was a temporary concern; she says he acknowledged  that she did not have the discretion

United States District Court
Northern District of California

to decline the assigned workload to lessen the burden on her team.  *Id.*  ¶¶ 92-96.  She also states that on multiple occasions in the first half of 2012 she discussed with Walker "the adverse effects that the unreasonably high volume of work was having on [her] Team."  *Id.* ¶ 97.  Walker "would merely acknowledge his understanding of the situation and would just say that the crushing workload was temporary."  *Id.* ¶ 98.

On September 7, 2012, Paul Vasallo, Walker's Chief of Staff, told Carroll that Hauprich had told him Walker was subjecting her to a hostile work environment, that Walker was lying and fabricating information and that he hated Hauprich.  Carroll Decl. ¶ 20;  Adelman Decl., Ex. 8 (Carroll Dep.) at 189.  When Carroll emailed Hauprich to ask her about these complaints, Hauprich initially denied that she had expressed such concerns but subsequently told Carroll she would "love to discuss with you what I had expressed."  Carroll Decl., Ex. M (email exchange).  Carroll testified that she spoke to Hauprich for about 45 minutes about her concerns and that Hauprich "was upset."  Adelman Decl., Ex. 8 (Carroll Dep.) at 192.  However, Carroll did not ask Hauprich about whether she felt she was being subjected to a hostile work environment;  nor did she ask Hauprich why she believed Walker was fabricating things about her or hated her.  *Id.* at 192-193.

Hauprich had another conversation with Carroll on October 12, 2012.  *Id.* at 198;  Hauprich Decl. ¶¶ 107-112.  Carroll's notes indicate that Hauprich complained that the situation with Walker was "exceedingly distressing."  Adelman Decl., Ex. 8 (Carroll Dep.) at 198.  Carroll also confirmed at her deposition that Hauprich was upset because in her oral midyear performance review she was not told about the concerns and negative comments that were the focus of her written review.  *Id.* at 205.  Carroll's notes indicate Hauprich told her that:  she "need[ed] to achieve twice as much as anyone else";  she had "a noose around her neck";  she was "constantly playing defense";  and that she was subject to a "consistent flow of false accusations" from Walker.  *Id.* at 208, 214.  Although Carroll was aware that the decision had already been made to terminate Hauprich, she advised Hauprich to meet with Walker and "people who were complaining to him or coming to him about her and talk about it together."  *Id.* at 215.

At some point, Hauprich also expressed concerns about Walker to Lori Fouché.   Adelman

19

Decl., Ex. 1 (Hauprich Dep.) at 217.

### 7.  Walker's Alleged Favoritism Towards Younger and Male Employees

According to Hauprich, "[o]n multiple occasions throughout the time period in which [she] reported directly to Mr. Walker, [she] heard Mr. Walker make the comment "young up and comer" in describing the type of employee who Mr. Walker viewed as promotable and desirable for upwardly mobile assignments."  Hauprich Decl. ¶ 54.  She states that "Mr. Walker would most often use the term 'young up and comer' when discussing career opportunities within Defendant and Allianz. However, I also heard Mr. Walker use the term 'young up and comer' when determining to which employees he should offer extra tickets which he possessed for attending a professional golf tournament."  *Id*. ¶ 55.

Hauprich also states in her declaration that when she mentioned that one of her direct reports, Craig Cendak, was requesting an assignment at the headquarters of FFIC's parent, Allianz, in Munich, Walker asked Hauprich the age of the employee.  *Id*. ¶ 56.  When Hauprich told Walker the employee was 39, Walker allegedly responded "by saying that was good, because he does not like to send people for Allianz assignments in Munich who are over 40 years old."  *Id*.

According to Hauprich, she observed Walker "defend the disrespectful, demeaning and negative interactions" of a male managerial employee in Mr. Walker's Finance Department who was significantly younger than Hauprich, Christian Kortebein.  Hauprich states that she had discussed the "on-going negative and non-collaborative conduct" of Christian Kortebein with Walker but that he "excused Mr. Kortebein's conduct by explaining that Mr. Kortebein was a young, ambitious and smart employee from Munich and people should listen to him."  *Id*. ¶ 57.  Walker testified that he did counsel Kortebein as to his substandard listening skills.  Egan Decl., Ex. I (Walker Dep.) at 10. Koretebein is nine years younger than Hauprich. JSUF ¶ 68.

Similarly, Hauprich states that Walker "defended the abusive, non-collaborative and angry conduct of another male managerial employee in Mr. Walker's Finance Department who was significantly younger than [Hauprich], Kendall Pead."  Hauprich Decl. ¶ 58.[11]  She states that on

---

[11] Pead was 43 years old as of January 31, 2014.  Adelman Decl., Ex. 16 (Interrogatory Responses).

one occasion when Mr. Walker was advising [Hauprich] that he thought this employee "should be accorded additional staff and responsibilities, I reminded Mr. Walker of Mr. Pead's abusive and non-collaborative conflicts with [Hauprich] and other Finance employees, and the fact that several of Mr. Pead's business partners had communicated serious complaints regarding Mr. Pead's lack of collaboration. In response, Mr. Walker acknowledged that he was aware of these concerns regarding Mr. Pead but Mr. Walker dismissed the concerns by stating that the complaints against Mr. Pead were merely "group think." *Id*. ¶ 58.

Hauprich also states that Walker "defended yet another managerial employee in [the] Finance Department, Doug Franklin, wherein Mr. Walker was aware of Mr. Franklin's explosive, intimidating and overbearing conduct." *Id*. ¶ 59. Hauprich offers as an example "on one occasion when [she] was speaking with Mr. Walker regarding a particular instance when Mr. Franklin reacted to a business issue in a hostile and threatening manner, Mr. Walker acknowledged that he too had witnessed Mr. Franklin act in such a manner." *Id*. According to Hauprich, Walker "excused Mr. Franklin by explaining that [he] had a very high level of 'passion.'" *Id*. Walker testified that he counseled Mr. Franklin on his substandard listening skills on occasion. Adelman Decl., Ex. 20 (Walker Dep.) at 10. Franklin is approximately four years younger than Hauprich. JSUF ¶¶ 48, 71.

Hauprich states that Walker socialized with employees Cendak, Kortebein and Franklin outside of work on multiple occasions. *Id*. ¶ 61. According to Hauprich, she "directly observed on an on-going basis throughout the time that Mr. Walker was [her] immediate Manager that he was much friendlier to, and more social with, his younger and male work colleagues." *Id*. According to Hauprich, the "only exception that [she] observed was Mr. Walker's very friendly interactions with a significantly younger female employee Althea Jaderquist." *Id*. ¶ 63. Walker promoted Jaderquist to the position of Assistant Vice President, Financial Planning and Analysis, on April 2012 and promoted her to Vice President, Financial Planning and Analysis, on October 7, 2013. Adelman Decl., Ex. 17 (FFIC Interrogatory Responses) at 7.

Hauprich states that Walker's interactions with Hauprich were "curt and negative in the isolated occasions when Mr. Walker was willing to speak to [her]." Hauprich Decl. ¶ 64.

### 8. Plaintiff's Replacement at FFIC

On November 10, 2012, Walker sent Morten Fischer an email alerting him to the fact that Hauprich's position would be available and suggesting they discuss the possibility of Fischer filling the position. Hauprich Decl., Ex. 11. According to Fischer, he and Walker met in Munich around Thanksgiving to talk about the possibility, but he was not formally interviewed. Adelman Decl., Ex. 7 (Fischer Dep.) at 88-89; *see also* Adelman Decl., Ex. 4 (Walker Dep.) at 382 (testimony that Walker did not interview anyone for the position because all the candidates were internal). Walker testified that he did not review Fischers' Curriculum Vitae prior to hiring Fisher but that he had "started working with [Fischer] in 2006 in Munich." Adelman Decl., Ex. 4 (Walker Dep.) at 383, 385. He also testified that when he joined FFIC in Novato, he began communicating with Fischer on "roughly a monthly basis." Egan Decl., Ex. D (Walker Dep.) at 24. Walker understood that Fischer's management experience included "at least one team lead opportunity" and that Fischer managed approximately three or four employees. *Id.* at 383. Around February 2013, Walker called Fischer to offer him the position, which Fischer accepted. Adelman Decl., Ex. 7 (Fischer Dep.) at 89.[12]

In April 2013, Fischer assumed Hauprich's former position of Vice President of Financial Consulting, a position he still holds. Egan Decl., Ex. D at 101. Previously, Fischer had worked for eleven years in Munich at Allianz SE's (FFIC ultimate parent) headquarters, where his final position was the Head of the Business Division for North America ("Business Head"), reporting directly to FFIC's Chairman. Declaration of Morten Fischer in Support of Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Fischer Decl.") ¶ 5. According to Fischer, in his role as Business Head, he represented the Allianz operating companies located in North America, including FFIC, and was "responsible for the strategic development of these companies." *Id.* ¶ 6.

---

[12] According to Hauprich, previously, the topic had been raised of Mr. Fischer "potentially being assigned to [FFIC] to report to [Hauprich]," and at that time, "both Lori Fouché and Jill Paterson stated to [Hauprich] that they did not like Mr. Fischer, but that if Allianz insisted on the assignment they would comply." Hauprich Decl. ¶ 115. Hauprich further states, "Mr. Fischer's Manager at the time subsequently took on another role and the transfer never occurred." *Id.* It is not clear when this occurred.

United States District Court
Northern District of California

1      Lori Fouché testified that she had interacted with Fischer "quite a bit" when he was

2   Business Head in Munich; she described his role as "representing the chairman [of Allianz] in

3   terms of either getting information, opining on the quality of things that [FFIC] did, and

4   questioning [FFIC] as to whether or not [FFIC was] pushing hard enough [or] pushing too hard."

5   Egan Decl., Ex. M (Fouché Dep.) at 43.  According to Fouché, Fischer participated in "strategic

6   dialogue conversations with Allianz at a corporate level" and in that capacity, "ma[d]e sure that

7   some of the questions that either [FFIC] had or that Germany might have that we were answering

8   them properly and if we were positioning them properly."  *Id.* at 43-44.  She further testified that

9   she had a "handful of conversations" with Walker about hiring Fischer in which she discussed her

10   "perceptions of Morten around a few key variables."  *Id.* at 42.  In particular, she testified that she

11   offered her opinions about Fischer's "knowledge . . . of finance" and discussed the fact that hiring

12   Fischer was an opportunity  to hire a person "who has a strong connection with Germany [and

13   who knows how to influence and get things done  for [FFIC] and represent [FFIC]."  *Id.*  She

14   testified that she did not offer opinions to Walker as to "things like leadership and his ability to

15   plan the team," however, because she "didn't have visibility with thing like" that.  *Id.*

16      Hauprich states that "[w]ith regards to Mr. Fischer's current claim that he was responsible

17   for Defendants 'strategic development,' based on [her] direct observations that was certainly not

18   the case at any point in time during [her] tenure with [FFIC]."  Hauprich Decl. ¶ 115.

19      According to Fischer, the grade assigned to his last position at Allianz SE was a 17 while

20   the grade assigned to his position as Vice President of Financial Consulting is a 15.  *Id.* ¶ 7.

21   Notwithstanding the lower grade, Fischer considers his current assignment "to add value to [his]

22   professional development because it provides [him] with the opportunity to gain firsthand

23   experience of working within an Allianz operating company outside of Germany."  *Id.* ¶ 8.

24      Fischer received his undergraduate degree in Germany and completed an MBA at Portland

25   State University.  JSUF ¶ 54.  In 2005, he received designation as a Chartered Financial Analyst

26   (CFA). JSUF ¶ 57. Fischer was 36 when he took on the rule of Vice President of Financial

27   Consulting at FFIC.  JSUF ¶ 64.   When he took the position of Vice President of Financial

28   Consulting, Fischer was not given any formal managerial training.  Adelman Decl., Ex. 4 (Walker

23

1    Dep.) at 388.   More generally, other than on-line training, Fischer did not receive formal FFIC

2    orientation or training when he assumed Plaintiff's prior position.  JSUF ¶ 65.

3        **B.    Complaint**

4        Plaintiff initiated this action on April 9, 2013.  She asserts five claims in her complaint:  1)

5    Age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29

6    U.S.C. §§ 621 *et seq.*, as amended by Title II of the Older Workers Benefit Protection Act of 1990

7    ("OWBPA"), 29 U.S.C. § 626(b); 2) Sex discrimination in violation of Title VII of the Civil

8    Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*; 3) Age discrimination in  violation of the

9    California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900 *et seq.*;  4)

10   Sex discrimination in violation of FEHA, Cal. Gov't Code § 12940(a);  and 5) Wrongful

11   termination in violation of public policy based on alleged violations of the ADEA, Title VII and

12   FEHA.

13       **C.    The Motion**

14       FFIC seeks summary judgment on all of Plaintiff's claims.  Applying the burden-shifting

15   framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), FFIC contends

16   Plaintiff's discrimination claims under the ADEA, Title VII and FEHA fail because Hauprich

17   cannot establish a prima facie case of age or sex discrimination and further, she cannot show that

18   the legitimate non-discriminatory reason offered by FFIC for her termination – namely,

19   Hauprich's alleged inability to adjust to a new, more collaborative culture –  is pretext.  Motion at

20   16-17.

21       With respect to the prima facie case, FFIC argues that Plaintiff will be unable to

22   demonstrate that: 1) she was performing her job competently; and 2) the adverse employment

23   actions occurred under circumstances suggesting a discriminatory motive.  Motion at 15-16.   As

24   to the former, FFIC argues that Plaintiff's high performance ratings are not sufficient to create a

25   fact question because the undisputed evidence shows that Plaintiff lacked the people skills that

26   were required when FFIC adopted a more collaborative approach.  *Id.* at 17-18.  With respect to

27   the requirement that the circumstances must suggest a discriminatory motive, FFIC contends there

28   also is insufficient evidence to demonstrate an issue of fact.  *Id.* at 18.  FFIC points out that three

United States District Court
Northern District of California

24

of the complaints lodged against Plaintiff were by women, all three of the executives who criticized Hauprich's communication and planning skills were over 40 years old and two were women. *Id*. FFIC points out that Carroll was more than ten years older than Hauprich. *Id*. Finally, FFIC argues that there is no admissible evidence that any similarly situated men or persons under 40 were treated more favorably than Plaintiff. *Id*.

As to the ADEA claim, FFIC makes the additional argument that Plaintiff's prima facie case fails because she cannot demonstrate that the qualifications of her replacement are similar to or inferior to her own. *Id*. at 18. According to FFIC, the undisputed facts demonstrate that Morten Fischer is more qualified than Hauprich because his previous job had a higher rating than Hauprich's, he had years of experience at the parent company and his MBA and Chartered Financial Analyst designation required years of study. *Id*. at 19.

FFIC further contends that even if Hauprich could make a prima facie case of discrimination, her claim fails because FFIC has offered a legitimate, non-discriminatory reason for its actions as well as evidence that it repeatedly criticized Plaintiff's listening and communication skills and counseled Plaintiff on this problem before finally terminating her. *Id*. at 19-20. FFIC also argues Plaintiff has offered no specific and substantial evidence of pretext. *Id*. at 21-24. In fact, FFIC argues, the circumstances support the opposite inference because: 1) prior to terminating Hauprich, Walker promoted her by putting her in charge of the Financial Consulting Group; and 2) the individuals who made the decision to terminate Hauprich were protected class members themselves. *Id*. at 24.

Finally, FFIC argues that the wrongful termination claim fails for the same reasons the statutory claims fail because it is based on those alleged violations.  *Id*. at 25.

In her Opposition, Plaintiff argues that the evidence is sufficient to make a prima facie case of discrimination and to demonstrate that the reason offered by FFIC for its termination of Hauprich was pretext. Opposition at 1. With respect to Plaintiff's ability to perform her job, a requirement for making a prima facie case, Plaintiff contends the proper focus is on objective criteria that are measurable rather than on subjective criteria such as communication skills. *Id*. at 20. According to Plaintiff, her "'objectively measurable qualifications' are impeccable." *Id*. As

United States District Court
Northern District of California

1  to  whether the circumstances of her termination suggest discrimination, Plaintiff points to

2  evidence that her replacement was only 36 years old when he assumed Hauprich's former position

3  and that he had substantially less managerial experience than Hauprich.  *Id*. at 21.

4          With respect to pretext, Plaintiff argues that similarly situated employees outside her

5  protected class were treated more favorably, citing Walker's references to "young up and comers,"

6  Walker's socializing and entertaining with younger and male employees and his alleged failure to

7  discipline younger male employees when they were non-collaborative or abusive.  *Id*. at 23.

8  Plaintiff also asserts the evidence shows her qualifications were "vastly superior" to those of

9  Morten Fischer.  *Id*.

10          In addition, Hauprich argues that pretext is apparent based on evidence of FFIC's

11 deviations from its own personnel policies to the extent that: 1) Walker downgraded Hauprich's

12 2011 performance review "despite the fact that Walker only managed Plaintiff for the final three

13 months of the year and without seeking any input from Plaintiff's managers over the first nine

14 months of the year;" 2) "Walker altered Plaintiff's 2012 goals such that Plaintiff's goals were less

15 quantifiable than other employees in violation of Defendant's goal setting policy;"  3) "Walker

16 excluded from Plaintiff's 2012 Mid-Year Assessment Plaintiff's 'Strengths and Significant

17 Accomplishments' and included negative criticisms which contradicted what Walker had already

18 admitted regarding Plaintiff's strong performance;" 4) Walker did not provide Hauprich "the

19 specific, objective and time bound performance counseling and verbal and written warnings to

20 which all employees are entitled pursuant to Defendant's progressive discipline policies and

21 practices;" and  5) Walker terminated Hauprich without having complied with FFIC's progressive

22 discipline policy.  *Id*. at 24.  Hauprich also cites as evidence of pretext Walker's testimony that he

23 has never terminated an employee based on their "soft skills" or "how they do things as opposed

24 to the results that they achieve."  Motion at 6 (citing Adelman Decl., Ex. 3 (Walker Dep.) at 109-

25 110).

26          Finally, Plaintiff argues that the "vague and subjective" reasons offered for firing Hauprich

27 themselves support a finding of pretext.  *Id*. at 24-25.

28          In its Reply brief, FFIC argues that Hauprich has not disputed many of the key facts

26

relating to her claims, including Defendant's evidence that FFIC underwent a change in leadership that resulted in a dramatic change in the performance expectations for Plaintiff and other Finance Department employees, that the new focus was on collaboration rather than confrontation, that Walker and Carroll counseled Hauprich as to her deficient management style, that at least four subordinates submitted complaints about her, that Hauprich never complained about sex or age bias, that Hauprich was promoted when Walker first arrived at FFIC and that the individuals involved in Hauprich's termination were over 40 and three of them were women.  Reply at 1.

FFIC reiterates its position that Plaintiff cannot establish a prima facie case of discrimination or pretext.  *Id*. First, it argues that the objective evidence shows that Plaintiff was not competently performing her job and that it is performance rather than job qualifications that matter.  *Id*. at 2. Second, it argues that Hauprich cannot demonstrate pretext based on her "unsubstantiated, subjective assessment" of Fischer's qualifications.  *Id*. at 3.  According to FFIC, the fact that Fischer's former position was rated a 17 while Plaintiff's position was rated a 15 "unequivocally establishes that FFIC viewed Fischer's qualifications as superior to Plaintiff's, especially since both Fischer and Plaintiff have master's degrees and professional certifications." *Id*. Third, FFIC argues Plaintiff mischaracterizes Walker's deposition testimony that he has never terminated an employee based on "soft skills," arguing that Walker consistently testified that Hauprich failed to meet expectations due to her management approach.  *Id*. at 4.

FFIC also argues that Plaintiff has failed to rebut, or even address, its arguments that there can be no inference of discriminatory intent because: 1) all the people involved in the decision to terminate Plaintiff were in the same protected class; and 2) Walker had promoted Hauprich less than a year before he terminated her.  *Id*. at 5-6.

FFIC also rejects Plaintiff's assertion that Walker favored similarly situated employees outside of Plaintiff's protected class.  *Id*. at 6.  In fact, FFIC asserts, the three managers Hauprich contends were treated more favorably, Kortebein, Franklin and Pead, were not similarly situated.  *Id*. at 7.  In particular, although Hauprich states that all three are "managerial employees" in the Finance Department, Hauprich Decl. ¶¶ 57-59, FFIC points out that Pead did not report directly to Walker (in contrast to Hauprich).  *Id*. at 7 (citing Adelman Decl., Ex. 16 (Interrogatory Responses)

at 3-4).  Kortebein and Franklin did report directly to Walker but, according to FFIC, the nature of the work they performed differed from that of Plaintiff's group;  in particular, while Plaintiff's group provided consulting support to FFIC's business lines and internal support services, Kortebein and  Franklin were "risk takers" with highly technical actuarial skills and whose groups provided oversight and strategic direction of FFIC's underwriting and risk management.  *Id*. (citing Adelman Decl., Ex. 16 (Walker Dep.) at 9);  Supplemental Declaration of Noreen Carroll in Support of Defendant's Reply in Support of its Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Carroll Supp. Decl."), ¶¶ 5-6;  Egan Supp. Decl., Ex. C (Walker Dep.) at 8, Ex. F (Franklin Dep.) at 26-27, 54).  According to FFIC, Franklin and Kortebein were also at a higher level in the company than Hauprich because they held chief-level positions and were Senior Vice Presidents whereas Hauprich was a vice president.  *Id*. (citing Adelman Decl., Ex. 16 (Interrogatory Responses) at 3; Carroll Supp. Decl. ¶ 3).  Finally, FFIC points to evidence that Franklin and Kortebein were "subject to a different standard than Plaintiff [because] as risk takers, their performance expectations were dictated by a formal performance plan administered by FFIC's parent company."  *Id*. (citing Carroll Supp. Decl. ¶ 7).

FFIC further contends the evidence does not show these employees were treated more favorably than Plaintiff.  *Id*. at 8.  In particular, Walker testified that he counseled Kortebein and Franklin on their communication skills.  *Id*. (citing Adelman Decl., Ex. 20 (Walker Dep.) at 9-10; Egan Decl., Ex. I (Walker Dep.) at 10-11).  FFIC also argues that Hauprich has presented no evidence that the communication styles of Pead, Franklin and Kortebein were having a negative impact on the business or that their subordinates had lodged any complaints about them.  *Id*.  In contrast, FFIC points to evidence that Hauprich's communication style was having a negative impact and that her subordinates had lodged complaints against her.  *Id*. (citing Egan Decl., Ex. M (Fouché Dep.) at 25).   In addition, FFIC points to Walker's promotion of Althea Jaderquist as evidence that undermines any inference of discriminatory motive.  *Id*. at 8.

FFIC also argues that the "young up and comer" comments allegedly made by Walker are insufficient to establish pretext and that in fact, the case law supports a contrary conclusion.  *Id*. (citing *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992)).  FFIC asserts that Walker's

1    alleged social activities outside of work with young and male colleagues lack factual support and

2    are not probative of pretext because there is no showing that these individuals benefited to

3    Hauprich's detriment.  *Id.* at 9.

4         FFIC argues that Walker's failure to include any "Strengths and Significant

5    Accomplishments" in her 2012 mid-year review is not probative of pretext because Plaintiff has

6    not presented any evidence that Walker included this in the mid-year reviews of his other direct

7    reports.  *Id.* at 9.  According to FFIC, Hauprich also did not offer any evidence that she actually

8    gave her "Strengths and Significant Accomplishments" to Walker before he conducted the review.

9    *Id.* at 10.

10        FFIC also contends that Hauprich mischaracterizes FFIC's disciplinary process, pointing to

11   the plain language of the progressive discipline guidelines stating that FFIC does not adhere to a

12   strict procedure for progressive discipline but rather, allows managers discretion  – even as to

13   whether progressive discipline should be used.  *Id.* (citing Nelson Decl., ¶¶ 3-4 & Ex. A).

14        FFIC argues that Hauprich also ignores the evidence showing that the overall rating she

15   received on her 2011 Performance review was a product of a group decision by the ELG rather

16   than an individual decision by Walker.  *Id.* at 11.  According to FFIC, this evidence further

17   undermines Hauprich's contention that her lower overall rating that year was a reflection of

18   Walker's discriminatory animus.  *Id.*

19        Finally, FFIC objects to numerous sections of Hauprich's Declaration as well as Exhibits

20   10-12, 14 and 18 attached thereto.  *Id.* at 15.[13]

21   **III.    ANALYSIS**

22       **A.    Legal Standard under Rule 56**

23        Summary judgment on a claim or defense is appropriate "if the movant shows that there is

24   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

25   law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

26   the absence of a genuine issue of material fact with respect to an essential element of the non-

27

28   _____
     [13] Because the Court's holding is not based on the evidence to which FFIC objects, the Court
     declines to rule on FFIC's objections.

United States District Court
Northern District of California

moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.

## B. *McDonnell Douglas* Standard

Plaintiff asserts claims for age discrimination under the ADEA and FEHA; she asserts claims for sex discrimination under Title VII and FEHA.[14] As to all of these claims, a plaintiff who has no direct evidence of discrimination may prove discrimination using indirect, or circumstantial evidence, under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying *McDonnell Douglas* framework to ADEA discrimination claim); *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000) (holding that because of similarity between state and federal employment discrimination laws California has adopted the *McDonnell Douglas* approach to claims of discrimination under FEHA); *Vasquez v. County of Los Angeles*, 349 F.3d 634. 640 (9th Cir. 2003) (applying *McDonnell Douglas* framework to Title VII discrimination claim).

Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions. *Id.* If this burden is met, the plaintiff "must then raise a triable issue of material fact as to whether the

---

[14] The parties agree that Plaintiff's wrongful termination claim stands or falls on her discrimination claims, that is, that her wrongful termination claim survives summary judgment only if one of her underlying discrimination claims survives.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    defendant's proffered reasons for [the employee's] termination[ ] are mere pretext for unlawful

2    discrimination." *Id.* "The plaintiff may show pretext either (1) by showing that unlawful

3    discrimination more likely motivated the employer, or (2) by showing that the employer's

4    proffered explanation is unworthy of credence because it is inconsistent or otherwise not

5    believable." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005)

6    (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir.1998)).   An employer's

7    non-discriminatory reason is not rebutted where "the employee simply show[s] the employer's

8    decision was wrong, mistaken, or unwise." *Horn v. Cushman & Wakefield Western, Inc.*, 72 Cal.

9    App. 4th 798, 807(1999).

10      The employee must offer "'specific, substantial evidence of pretext.'" *Wallis v. J.R.*

11    *Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994) (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th

12    Cir.1983)). The evidence as to pretext must be considered cumulatively. *Chuang v. University of*

13    *California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000).

14      "At summary judgment, the degree of proof necessary to establish a prima facie case is

15    'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v.*

16    *England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885,

17    889 (9th Cir.1994)). To establish a prima facie case of discrimination, Plaintiff must show that: (1)

18    she is a member of a protected class; (2) she was qualified for her position and performing her job

19    satisfactorily; (3) that she experienced adverse employment actions; and (4) that "similarly

20    situated individuals outside [her] protected class were treated more favorably, or other

21    circumstances surrounding the adverse employment action give rise to an inference of

22    discrimination." *Id.* (quoting *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 603 (9th

23    Cir.2004)).

24      In the case of the ADEA, the fourth requirement for making a prima facie case is stated

25    somewhat differently, requiring that the employee demonstrate that he or she was replaced by a

26    "substantially younger employee[ ] with equal or inferior qualifications." *Nidds v. Schindler*

27    *Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1997).  In *Nidds*, however, the court explained that

28    this requirement "has been treated with some flexibility," stating as follows:

"We have held that the failure to prove replacement by a younger employee is 'not necessarily fatal' to an age discrimination claim where the discharge results from a general reduction in the work force due to business conditions." *Rose*, 902 F.2d at 1421; see also *Ewing v. Gill Indus., Inc.*, 3 Cal.App.4th 601, 4 Cal.Rptr.2d 640, 645 (1992). Rather, courts "require instead that the plaintiff show through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Rose*, 902 F.2d at 1421. This inference "can be established by showing the employer had a continuing need for his skills and services in that his various duties were still being performed," *Wallis*, 26 F.3d at 891 (internal quotation omitted), or by showing "that others not in her protected class were treated more favorably." *Washington*, 10 F.3d at 1434.

*Id.*

## C.   Whether Plaintiff Has Made a Prima Facie Case of Discrimination

FFIC contends Hauprich cannot make a prima facie case of sex or age discrimination because: 1) the undisputed facts show that she was not performing her job satisfactorily; and 2) the facts surrounding the alleged adverse employment action do not give rise to an inference of discrimination.  As to the ADEA claim, FFIC also argues that Hauprich cannot meet her burden because her replacement, Morten Fischer, is more qualified than Plaintiff.    The Court disagrees.

### 1.   Whether Plaintiff Can Demonstrate She Was Performing Her Job Satisfactorily

The Ninth Circuit has "long held that subjective criteria should not be considered in determining whether a plaintiff is 'qualified' for purposes of establishing a prima facie case under *McDonnell Douglas*." *Nicholson v. Hyannis Air Service, Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009) (citing *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1345 n. 8 (9th Cir.1981)).  In *Lynn*, an employment discrimination case involving a college professor who was denied tenure, the court addressed whether evidence of the individual's insufficient scholarship should be considered as part of the prima facie case analysis or at the later stage of the *McDonnell Douglas* framework that addresses pretext.  In that case, there was evidence that the plaintiff had been warned throughout her career "that her scholarship was suspect" and it was for this reason, the defendant claimed, the tenure review committee had denied tenure. 656 F.2d at 1344.  The court found that "[t]he qualifications that are most appropriately considered at step one are those to which objective criteria can be applied, such as level of education, years of teaching experience, in general and at

32

United States District Court
Northern District of California

the particular institution, and the publication of scholarly materials." *Id.* at 1345 n. 8.  The court

explained that "job qualifications are best treated at step one and subjective criteria, along with

any supporting evidence, are best treated at the later stages of the process." *Id.* at 1344.  It

continued, "[t]o do otherwise would in many instances collapse the three step analysis into a

single initial step at which all issues would be resolved [which] would defeat the purpose

underlying the *McDonnell Douglas* process." *Id.*

The reasoning of *Lynn* is applicable here.  FFIC claims to have terminated Hauprich for a

legitimate, non-discriminatory reason, namely, that Hauprich had poor listening and

communication skills – skills it contends were essential after Walker introduced a new culture of

collaboration in the Finance Department.  As in *Lynn*, the issue of whether FFIC's contention that

Hauprich was not qualified for her position is credible is best addressed in the context of the

pretext analysis, at step three of the *McDonnell Douglas* framework.  At the first step of the

analysis, where Plaintiff is required to offer only minimal proof that she was qualified for her

position, Plaintiff's academic training, many years of experience at FFIC and consistently positive

performance ratings are sufficient to meet Plaintiff's burden.

### 2.   Whether Plaintiff Can Demonstrate that Circumstances of Adverse Employment Action Give Rise to an Inference of Discrimination

FFIC contends the circumstances of Hauprich's termination do not give rise to an inference

of sex or age discrimination sufficient to make a prima facie case. The Court concludes that this

factor is met with respect to sex discrimination because it is undisputed that FFIC replaced

Hauprich with a male (Morten Fischer).  The Court also finds that this factor is met as to age

discrimination because Fischer is significantly younger than Hauprich and a jury reasonably could

conclude that Fischer was less qualified than Hauprich to perform the job.

A female employee bringing a claim for sex discrimination may satisfy the fourth

requirement for making a prima facie case by showing that "similarly situated men were treated

more favorably, or her position was filled by a man." *Villiarimo v. Aloha Island Air, Inc*., 281

F.3d 1054, 1062 (2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973);  *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).  Thus, the undisputed fact that

33

Hauprich's position was filled by a man within six months after her termination is sufficient to meet the very low evidentiary threshold to meet the fourth prima facie case requirement.  FFIC's extensive arguments about why the circumstances surrounding Hauprich's termination do *not* support an inference of discrimination are more appropriately addressed at the pretext stage of the analysis.

With respect to age discrimination, the fourth element can be met by showing that the plaintiff was "replaced by a substantially younger employee with equal or inferior qualifications." *Nidds*, 113 F.3d at 917.  It is undisputed that Hauprich's replacement, Morten Fischer, was 36 years old when he assumed Hauprich's position and thus was substantially younger than Plaintiff. The evidence is mixed as to whether Fischer's qualifications were equal or inferior to Hauprich's. As FFIC concedes, both Hauprich and Fischer had master's degrees and professional certifications.   Reply at 3 (citing JSUF ¶¶ 3-4, 54 & 57).  While FFIC presented evidence that Fischer's position carried a higher numerical grade than Hauprich's[15] and that Fischer reported directly to FFIC's head, Hauprich presented evidence that she had significantly more managerial experience than Fischer did when he was hired, both in terms of years of experience and number of employees working under her.  On summary judgment, Plaintiff need only demonstrate the existence of a triable issue of fact as to this factor.  *See Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1211 n. 4 (9th Cir. 2008) (fourth element of prima facie case in ADEA case is met if there is a "triable issue of fact," that is, the "circumstantial evidence is  . . . cumulatively sufficient to permit reasonable jurors to infer that [the plaintiff]  was discriminated against because of his age.").  Plaintiff has met that burden. Therefore, the evidence is sufficient to make a prima facie case, giving rise to a rebuttable presumption of discrimination on the basis of both age and sex.

---

[15] Fischer's testimony that his position at Allianz in Munich was a "17" while Hauprich's was a "15" does not strongly support the inference that Fischer was more qualified than Hauprich. The Court notes that FFIC has presented no evidence to show the significance of the grades assigned to these positions or the criteria used to determine the grades.

United States District Court
Northern District of California

1

**D.     Pretext**

2       At the second step of the *McDonnell Douglas* analysis, the burden of production shifts to

3   FFIC to articulate a legitimate, non-discriminatory reason for terminating Plaintiff.[16]   FFIC has

4   done so, asserting that Hauprich's termination was not based on gender or age but instead was the

5   result of her poor leadership and communication skills, as documented in a series of performance

6   reviews and other evidence.  According to FFIC, Hauprich's difficulties in this area became a

7   significant problem for FFIC after a change in corporate leadership that resulted in a move to a

8   more collaborative approach in the Finance Department.   In the face of the non-discriminatory

9   reason offered by FFIC, the burden shifts to Plaintiff to present "specific" and "substantial"

10  evidence that the reason is pretext and that the real reason for her termination was her age and/or

11  or gender.  *See Wallis v. J.R. Simplot Co*., 26 F.3d 885, 890 (9th Cir.1994).

12      Plaintiff argues that there is sufficient evidence to establish a triable issue of fact as to

13  pretext based on evidence that: 1) Walker favored "young up and comers" who were younger than

14  Plaintiff and male;  2) FFIC deviated with its general practices as to performance reviews and

15  progressive discipline with respect to Plaintiff's performance reviews and ultimate termination;

16  and 3) FFIC offered only "vague and subjective" reasons for firing Hauprich; and 4) Plaintiff's

17  qualifications were "vastly superior" to those of her younger male replacement.  The Court

18  concludes the evidence regarding the disparity in qualifications between Hauprich and Fischer is

19  sufficient to create a material dispute of fact as to pretext and therefore does not reach Plaintiff's

20  remaining arguments.

21      The Ninth Circuit has "held that a finding 'that a Title VII plaintiff's qualifications were

22  clearly superior to the qualifications of the applicant selected is a proper basis for a finding of

23  discrimination.'"  *Raad v. Fairbanks North Star Borough School Dist*., 323 F.3d 1185, 1194 (9th

24  Cir. 2003) (quoting *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1492 (9th Cir.1995)).  The *Raad*

25

26  ───────────────

[16] In her Opposition brief, Plaintiff states that she was subjected to three adverse employment
27  actions: her termination, the downgrading of her 2011 performance rating and her 2012 mid-year
    performance review.  Opposition at 21.  Her arguments with respect to pretext do not differentiate
28  between these three actions, however.  As Plaintiff frames her arguments primarily with reference
    to her termination, the Court does the same.

United States District Court
Northern District of California

court pointed out that in *Odima*, "plaintiff's superior qualifications *standing alone* were enough to prove pretext and, on that basis, [the court] affirmed the district court's entry of judgment for the plaintiff following a bench trial." *Id.* (emphasis in original).  It went to note that "[u]nlike the Tenth Circuit*, see Bullington v. United Air Lines, Inc*., 186 F.3d 1301, 1319 (10th Cir.1999), we have *never* followed the Fifth Circuit in holding that the disparity in candidates' qualifications "must be so apparent as to jump off the page and slap us in the face to support a finding of pretext." *Id.* (citing *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir.1993)).  The court went on to caution that "[t]his is especially true at the summary judgment stage," when the court must draw all reasonable inferences in favor of the party opposing summary judgment. *Id.*   Nonetheless, "there must still be a 'pronounced difference between [ Hauprich's and Fischer's] qualifications' to raise a genuine dispute of fact." *Coleman v. Donahoe*, 2013 WL 2297096 (D.Alaska, May 24, 2013) (quoting *Raad*, 323 F.3d at 1194).

The Court concludes that Hauprich has offered "specific" and "substantial"  evidence showing that there is a "pronounced difference" between the qualifications of Hauprich and Fischer.  Although both hold similar degrees and certifications,  Hauprich had many more years of experience and had extensive experience managing large numbers of employees.   Although Fischer worked at a higher level of the corporate structure, and apparently was involved in high-level strategic dialogue between Allianz and FFIC, there is almost no evidence as to Fischer's qualifications with respect to managing multiple or large teams of people, which a jury could reasonably conclude was an important  requirement for Hauprich's position.  Walker testified that he worked with Fischer in Munich but does not describe any strengths or accomplishments Fischer displayed when the two worked together.   Similarly, Fouché testified that she had interacted with Fischer in strategic conversations with Allianz but made clear that she had not had an opportunity to develop an opinion about Fischer's "leadership and his ability to plan the team."  Egan Decl., Ex. M (Fouché Dep.) at 42.   Indeed, the only evidence in the record relating to Fischer's experience managing other employees is Walker's testimony reflecting that Fischer had significantly *less* managerial experience than Hauprich, namely, his testimony that he understood Fischer's management experience included "at least one team lead opportunity" and that Fischer

36

had managed approximately three or four employees.  Egan Decl., Ex. M (Walker Dep.) at 383.

Finally, the Court rejects FFIC's reliance on the numerical rating assigned to Fischer's former position as compared to Hauprich's to show that Fischer was more qualified than Hauprich.  As discussed above, FFIC has offered no evidence about these ratings, such as the criteria or required qualifications on which they are based.  Consequently, the ratings do not support a reasonable inference that Fischer was more qualified than Hauprich for Hauprich's position.  Drawing all reasonable inferences in favor of the non-moving party,  the Court finds that a jury could reasonably conclude based on the evidence presented by Hauprich regarding the disparity in qualifications that the reasons offered by FFIC for terminating Hauprich were pretext.

## IV.     CONCLUSION

For the reasons stated above, the Motion is DENIED.

**IT IS SO ORDERED.**

Dated:  June 26, 2014

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California